## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CRAIG STREIT,**

    **Plaintiff,**

**v.**                                          **Case No.  8:04-cv-121-T-30MAP**

**THE GUARDIAN LIFE INSURANCE**
**COMPANY OF AMERICA,**

    **Defendant.**
_____/

## **ORDER**

THIS CAUSE comes before the Court upon cross-motions for summary judgment and memoranda in opposition thereto filed by the parties.  Plaintiff's cause of action, arising under the Employment Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), challenges the Defendant's decision to deny his claims for short-term and long-term disability.[1]  For the reasons outlined below, this Court finds that summary judgment should be entered in favor of Plaintiff.

### **I. Undisputed Facts**

Plaintiff was employed by Tantivy Communications, Inc. ("Tantivy") as Vice President for Marketing beginning on April 1, 2001.  At the end of the work day on

---

[1] At the beginning of the disability claims process, Plaintiff was filing for short-term disability benefits.  As the appeals process continued, the parties eventually agreed to treat the short-term disability claim and long-term disability claim jointly.  In accordance with this agreement, the parties have argued their motions for summary judgment without distinguishing between short-term and long-term disability.  This Court, therefore, addresses both Plaintiff's short-term and long-term disability claims, but without distinction.

September 14, 2001, Plaintiff was terminated by Tantivy.[2]  Six days later, Plaintiff was treated by his primary care physician, Dr. Atkinson, for stress and depression related to the September 11, 2001, terrorist attacks on America and the loss of his job.  Based on his evaluation, Dr. Atkinson concluded that Plaintiff was "having a tremendous amount of stress and strain" and the "etiology of the stress is ultimately related to the recent world crisis as well as being laid off."  Dr. Atkinson wrote Plaintiff a prescription for Ativan, and directed Plaintiff to return in two weeks for a follow-up visit.

Instead of returning in two weeks, Plaintiff returned to Dr. Atkinson seven days later on September 27, 2001.  Dr. Atkinson's medical records indicate that Plaintiff was "really doing poorly" and that his "stress reaction" was "very severe."  Dr. Atkinson stated that he was increasing Plaintiff's Ativan prescription and indicated that he was "going to need to get [Plaintiff] in to see a therapist at this time."  Four days after this follow-up visit with Dr. Atkinson, Plaintiff began therapy treatment with a psychologist, Dr. Fairchild.  Plaintiff returned to Dr. Fairchild three days later on October 4, 2001, and had successive visits on October 8, 10, 18, 23, and 31, 2001.

Plaintiff filed his claim for disability on November 1, 2001, using the claim forms he requested from Tantivy on October 18, 2001.  The "physician section" of the claim form was completed by Dr. Fairchild.  Dr. Fairchild indicated that Plaintiff was diagnosed with post-traumatic stress disorder ("PSTD") and major depression, listed September 11, 2001, as the

---

[2] The parties dispute the underlying reason for Plaintiff's termination, but both agree that this decision was unrelated to Plaintiff's claimed disability.

date Plaintiff's symptoms first appeared, and listed September 14, 2001 as the date Plaintiff became "totally disabled."

Defendant, acting as the "Claims Administrator" under the insurance policy funding Tantivy's disability plan, reviewed Plaintiff's disability claim. Tantivy's disability plan provides disability benefits for Tantivy's covered employees who become "totally disabled" while the "employee is insured by [the] plan." An employee is "totally disabled" for purposes of the plan when the "employee is completely unable to perform the major duties of his or her regular occupation on a full-time basis due to sickness or injury." Under the terms of the plan, a covered employee's disability insurance coverage can end on a variety of dates, including "the date [the employee's] active full-time service ends for any reason." To actually receive disability payments, an employee claiming total disability must, *inter alia*, "become totally disabled while insured by this plan," and "be under a doctor's regular care for the cause of his or her disability . . . and [be] receiving appropriate medical care for the cause of his or her disability and for any other sickness or injury which exists before, or occurs during, the period the employee is disabled under the plan."

Following a review of Plaintiff's claim forms, Defendant sought additional information in the form of medical records and treatment notes from Dr. Atkinson and Dr. Fairchild. Defendant also requested that Dr. Fairchild complete and return a five-page questionnaire seeking information related to his evaluation and treatment of Plaintiff. Dr. Fairchild repeated on the questionnaire that Plaintiff's PTSD and major depressive disorder were the causes of Plaintiff's disability. He also stated in the affirmative that hospitalization

has been considered, and identified Plaintiff's current mental status as "severly depressed, intrusive thoughts, severe sleeping prob, suicidal ideation, nightmares." When asked how familiar he was with Plaintiff's insurance policy and benefits, Dr. Fairchild stated that he had "no knowledge of [his patient's] insurance coverage [and] policy details are not relevant to my treatment of Mr. Streit." Dr. Fairchild also noted that there was "no evidence of malingering" on Plaintiff's part.

All of these records were transmitted to Defendant and became part of its administrative file on Plaintiff's claim. Defendant informed Plaintiff that his claim for disability was denied in a letter dated January 8, 2002.[3] Defendant explained that its decision was made because Plaintiff's "physician certified that total disability did not begin until October 1, 2001, which was the first day of treatment for [his] condition," and Plaintiff "was not actively at work on a full-time basis prior to the date [his] disability began."

Plaintiff appealed Defendant's decision, and transmitted additional information to Defendant as a part of the appeals process.[4] This additional information included a second questionnaire that Defendant asked Dr. Fairchild to complete, a January 15, 2002, letter from

---

[3] Defendant had sent an earlier letter to Plaintiff denying his claim in November, 2001. This decision was based on an exception to the policy for disabilities caused by work related injuries, and was later abandoned after Plaintiff's medical records demonstrated that this exception did not apply.

[4] Plaintiff continued his treatment with Dr. Fairchild on a regular basis throughout the claims process. Dr. Fairchild's treatment notes from Plaintiff's visits on November 7, 14, and 27, 2001; December 6, 12, 19, and 27, 2001; January 2, 8, 15, 23 and 30, 2002; and February 6, and 13, 2002 were all filed in support of Plaintiff's appeal.

Dr. Fairchild, and an Attending Physician's Statement completed by Dr. Fairchild and dated February 2, 2002.

In his answers to the second questionnaire, Dr. Fairchild repeated PTSD and "Major Depressive Disorder" as the diagnoses. In response to the question how Plaintiff's condition prevented Plaintiff from performing the essential duties of his occupation as a vice president for marketing, Dr. Fairchild explained that the "dysphoria, decreased and restless sleep and other symptoms significantly impair Mr. Streit's ability to focus on the complex tasks and demanding cognitive functioning of his occupation as VP for Marketing." As for the any treatment restrictions that were placed on Plaintiff "to prevent him from being able to perform the essential duties of his occupation," Dr. Fairchild explained that "stressful, interpersonal interactions related to issues of trust would be extremely detrimental to Mr. Streit's condition and progress in therapy."

In the January 15, 2002, letter, Dr. Fairchild stated that "based on my clinical experience and specific knowledge of Mr. Streit's case, it is my professional opinion that his total disability commenced on September 14, 2001." In the Attending Physician's Statement, he stated that "anxiety and depression significantly interfere with interpersonal interaction" and checked the box indicating that Plaintiff was "completely unable to work."

As part of the appeals process, Plaintiff also sent Defendant a letter from Dr. Atkinson on January 18, 2002. Dr. Atkinson's letter stated that it was his professional opinion that Plaintiff's total disability "commenced on September 14, 2001, and was precipitated by events that occurred on September 11 and September 14, 2001."

Defendant denied Plaintiff's appeal on February 28, 2002. Plaintiff continued to appeal Defendant's decision after he moved to Connecticut in 2002 and as late as May 19, 2003. In support of his appeal, Plaintiff filed additional records from Richard S. Shapiro, Ph.D. indicating Plaintiff was continuing to seek treatment for his anxiety and depression and continued to be unable to work. The records from Dr. Shapiro indicated that Plaintiff became totally disabled on September 14, 2001. Notwithstanding these additional records, Defendant continued to uphold its denial decision.

## II.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In making this determination, all facts and reasonable inferences to be drawn therefrom are to be construed in the light most favorable to the non-movant. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).

## III.  Analysis

A court's first step in determining whether to uphold the denial of a plaintiff's disability claim under ERISA is normally to identify the appropriate standard of review used to examine the plan administrator's decision. In Firestone Tire and Rubber Co. v. Bruch, 489

U.S. 101, (1989), the Supreme Court established three distinct standards under ERISA for reviewing decisions by plan administrators. Id. at 115 (comparing ERISA law to trust law and adapting the standards of review from trust law to fit ERISA cases). These three standards are the de novo standard, arbitrary and capricious standard, and heightened arbitrary and capricious standard. Williams v. Bell South Telecommunications, Inc., 373 F.3d 1132, 1137-1138 (11th Cir. 2004).

The amount of deference granted to a plan administrator's decision varies considerably among these standards, and the standard of review employed by a court can often be outcome determinative. In this case, however, the appropriate standard of review of Defendant's decision is irrelevant because its decision should be reversed, even under the most deferential standard, for there were no "reasonable" grounds to support its denial of Plaintiff's disability claim. See id. (holding that a reversal of the plan administrator's decision is in order under the most deferential arbitrary and capricious standard when no "reasonable" grounds exist to support the decision).

Defendant's stated reason in its January 8, 2002, letter to Plaintiff for denying his disability claim was that "your physician certified that total disability did not begin until October 1, 2001, which was the first day of treatment for this condition." Defendant proceeded to explain that "[s]ince you were not actively at work on a full-time basis prior to the date your disability began, no benefits are payable." There are no reasonable grounds to support this determination for two reasons. First, Dr. Fairchild identified on Plaintiff's claim form that the date of Plaintiff's total disability was September 14, 2001. Second, it is

undisputed that Plaintiff worked a full day on September 14, 2001. Plaintiff, therefore, was not only actively at work on a full-time basis prior to the date his disability, he was actively at work on a full-time basis on the date of his disability. The denial of Plaintiff's claim based on these grounds, therefore, was arbitrary and capricious.

Defendant offered two alternative explanations for its denial of Plaintiff's claim after Plaintiff appealed its first decision in its letter of February 28, 2002. First, Defendant informed Plaintiff in rather confusing language that it could not find any "medical documentation showing treatment was rendered prior to September 20, 2001, and to substantiate a disability beginning while you were still insured under this plan of insurance." Defendant explained that "[s]ince [Plaintiff's] employment was terminated on September 14, 2001, [Plaintiff was] not considered an active, full-time employee, and therefore not insured at the time of [his] initial treatment on September 20, 2001." As an alternative basis for denying Plaintiff's disability claim, Defendant stated that "we have no information to conclusively document a functional impairment which would have precluded you from performing your occupational duties of Vice President of Marketing, as of the date you are claiming disability."

As with Defendant's explanation in its letter of January 8, 2002, these two explanations lack any "reasonable grounds." Defendant's first explanation that Plaintiff was not entitled to disability benefits because he failed to be treated for his disability prior to being terminated was arbitrary and capricious because the policy did not limit disability coverage to employees who begin treatment for their disability before they are terminated.

Rather, the policy's unambiguous terms defining "total disability" provide that the plan covers a "total disability that starts while an employee is insured by this plan." Thus, it is the date an employee becomes disabled that determines coverage for his/her disability, not the date the employee begins treatment.

It is beyond dispute that Plaintiff was claiming his disability began on September 14, 2001, after he was told of his job loss. It is also beyond dispute that Plaintiff's disability coverage did not expire until 11:59 p.m. on that day.[5] Accordingly, Plaintiff was covered by the plan at the time he claimed he became totally disabled.

Defendant attempts to rely on the section of the policy entitled "When And How This Plan's Net Monthly Payments Start" to support its interpretation of the policy that Plaintiff had to be seeking treatment before he was terminated in order to qualify for disability coverage. As an initial matter, nowhere in Defendant's February 28, 2002 denial letter does the Defendant reference this section of the plan or the provisions thereunder as the basis for its decision. On the contrary, Defendant characterizes its decision as one based on lack of coverage, rather than failure to comply with conditions necessary to receive benefit payments.

Even if the terms of this section were the terms upon which Defendant based its decision, its decision would still be subject to reversal. Contrary to Defendant's characterization of the meaning of this section's terms, the plain language simply does not

---

[5] This essential fact was affirmed by Dawn Morales, Defendant's Rule 30(b)(6) representative, during her deposition testimony on December 10, 2004.

require the insured to seek treatment before his/her termination. Rather, the provisions under this section merely require the insured to seek the "regular" and "appropriate" care of a doctor. Plaintiff clearly satisfied these conditions by meeting with Dr. Atkinson on September 20 and 27, 2001, and with Dr. Fairchild for significant and frequent treatments throughout the appeals process. No reasonable grounds existed, therefore, to support Defendant's denial of Plaintiff's claim based on Plaintiff's failure to undergo treatment for his disability prior to being terminated.

The alternative reason upon which Defendant relied to deny Plaintiff's claim is also without support. To support its determination that Plaintiff failed to demonstrate a "total disability," Defendant relies on conduct that it believes is suggestive of malingering. Defendant contends that it had reasonable grounds for denying Plaintiff's claim because Plaintiff worked from September 11 through September 14, 2001, and never mentioned disability to Tantivy "until thirty-four (34) days after his termination." Defendant also relies on Dr. Atkinson's failure to mention "any" disability in his treatment notes of September 20, 2001, to further support its decision. This evidence is not particularly suggestive of a false claim for disability, and Defendant's determination based thereon completely ignores the considerable and internally consistent medical documentation proffered by Plaintiff to support his claim.

Plaintiff's work from September 11th through the 14th has little bearing on the existence of his disability because Plaintiff never claimed he was disabled during this period. This information does not undermine Plaintiff's claim of disability because he always

maintained, and more importantly, all of his physicians maintained that the total disability began after Plaintiff learned that he lost his job. Additionally, the mere fact that Plaintiff failed to immediately request disability claim forms from Tantivy does not provide Defendant with a reasonable basis for concluding that Plaintiff was not disabled. The administrative record indicated that Plaintiff had sought medical treatment from two different doctors on seven occasions between the time he became disabled and when he requested the claim forms. Moreover, Plaintiff continued to seek regular and frequent treatment for his condition throughout the appeals process and beyond, and all of Plaintiff's treating physicians concluded that he was totally disabled.

The delay in Plaintiff's request for disability claim forms from his former employer can be explained by a number of plausible and innocent reasons. Moreover, Dr. Fairchild stated affirmatively that there was no evidence of malingering on the part of the Plaintiff. It is unreasonable for an administrator to conclude that the failure of an insured to commence the disability claims process within days of becoming disabled constitutes evidence of malingering, especially when the insured recently lost his job and is regularly pursuing medical treatment for a mental impairment. In fact, a request for disability claim forms prior to receiving a thorough examination and diagnosis by an appropriate physician might also invite allegations of malingering.

Finally, the failure of Dr. Atkinson to make a notation in his records that Plaintiff was disabled does not give Defendant reasonable grounds for denying Plaintiff's claim. Doctors are not in the business of insurance, and a false implication is not warranted when a treating

physician fails to comment in his medical records that a patient is disabled. Any conceivable weight that can be attributed to a doctor's failure to address the effect his patient's symptoms have on the patient's ability to work is surely superceded by an unequivocal letter of the doctor stating the patient is unable to work.

Dr. Atkinson's treatment notes from September 20, 2001, reflect an initial determination that Plaintiff was suffering from "a tremendous amount of stress." These notes also linked the severe stress directly to the September 11th terrorist attacks and Plaintiff's job loss. These notes are entirely consistent with the medical opinion he formed. Moreover, his prognosis was entirely consistent with the treatment notes and medical opinion of Dr. Fairchild. Because all of the medical records, treatment notes, physician letters, and physician questionnaires provided to Defendant supported Plaintiff's claim that he became totally disabled on September 14, 2001, Defendant lacked reasonable grounds to deny Plaintiff's claim based on the failure to document a total disability.

### III. Conclusion

The Court acknowledges that the result in this case is surprising considering Plaintiff is found to be entitled to disability benefits for a disability that occurred because he was terminated from his employment. But, the Court notes that Defendant's failure to have the Plaintiff examined by a doctor caused this case to turn on the Plaintiff's submitted medical information and the language of the policy. The plain language of the employer's policy provided disability coverage for disabilities that occurred between the moment its employee was terminated and the last minute of the day on which such termination occurred. Because

all of Plaintiff's treating physicians formed the same opinion that Plaintiff became totally disabled during this small span of time, and because Defendant had no reasonable grounds for disregarding these opinions, Plaintiff is entitled to summary judgment.[6]

It is therefore ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Summary Judgment (Dkt. #21) is **GRANTED**. Accordingly, Plaintiff is entitled to **$139,801.60** in disability benefits owed, plus interest. So that the Clerk can enter a final judgment in favor of the Plaintiff, the parties are directed to determine the amount of interest that properly has accrued on the aforementioned disability amount and file this information with the Court **within twenty (20) days** of the date of this Order. Plaintiff is also directed to file any motion for attorney's fees and costs **within twenty (20) days** of the date of this Order.

2. Defendant's First Motion for Summary Judgment (Dkt. #22) is **DENIED**.

3. Defendant's Motion for Leave to File a Reply (Dkt. #50) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on June 24, 2005.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

---

[6] Defendant filed a Motion for Leave to File a Reply (Dkt. # 50) on the grounds that Plaintiff was seeking to make new law and Plaintiff misstated the law. Like most ERISA cases, this case was fact specific and the Court's findings were based on the interpretation of the Tantivy disability policy and the other undisputed facts of the case. Accordingly, Defendant's Motion for Leave to File a Reply is not warranted.